**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**

In the matter of:

AUTHENTIKI, LLC,                                Case No. 20-03322
                                                Chapter 11 (Subchapter V)
          Debtor                                Honorable James W. Boyd
_____/

In the matter of:

MSSH, LLC,                                      Case No. 20-03323
                                                Chapter 11 (Subchapter V)
          Debtor                                Honorable James W. Boyd
_____/

**DECLARATION OF MARK A SELLERS, III IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

In support of the above-captioned Debtors' Chapter 11 Petitions and their First Day Motions (defined below), I, Mark. A Sellers, III, declare as follows:

1. I am the Manager of Authentiki, LLC ("Authentiki") a Michigan limited liability company with its principal place of business at 58 Ionia Avenue SW, Grand Rapids, Michigan 48503 (the "Restaurant Location").

2. I own 45.93% of Authentiki's outstanding membership interests. The remaining outstanding member interests are owned as follows:

| Member | Ownership Percentage |
|---|---|
| Juniper Engineering, Inc. | 23.3% |
| Masters of Rum, LLC | 29.67% |
| Michael Souriolle | 1% |

3. Authentiki was established in July 2018 to own and operate tiki-themed restaurants through wholly owned subsidiaries. To date, Authentiki has only established one subsidiary that operates one restaurant.

4. Authentiki owns 100% of the outstanding member units of MSSH, LLC d/b/a Max's South Seas Hideaway ("MSSH"), which was formed in April 2019 and has its principal place of business at the Restaurant Location.

5. MSSH operates a tiki-themed restaurant, Max's South Seas Hideaway, (the "Restaurant") from the Restaurant Location, which was recently voted "Best New Restaurant in West Michigan" by Revue Magazine readers.

6. Authentiki provides back-office administrative support for the Restaurant and its operations. For example and as discussed in more detail herein, Authentiki handles the payroll and employee benefit functions for the Restaurant employees, and the costs of the payroll and employee benefits are solely paid by MSSH.

7. MSSH does not pay a management fee to Authentiki for the administrative services Authentiki provides to MSSH.

8. Authentiki and MSSH (collectively, the "Debtors" and each a "Debtor") filed for bankruptcy protection under Subchapter V of Chapter 11 of the United States Code (the "Bankruptcy Code") on October 29, 2020 (the "Petition Date").

9. The Debtors continue to operate the Restaurant from the Restaurant Location, which is leased from Ionia Retail, LLC (the "Landlord") by MSSH.

10. I am responsible for devising and implementing the Debtors' business plans and strategies, overseeing the Debtors' financial, operational and legal affairs, and supervising the maintenance of its books and records. I have been involved in the Debtors' restructuring process (the "Restructuring Process"), which includes (i) participating in the development, negotiation and implementation of various strategic alternatives for restructuring, reducing or modifying the Debtors' indebtedness, (ii) managing professionals engaged by the Debtors in connection with

{00874315.2}

2

the Restructuring Process, (iii) supervising the preparation of documentation needed to implement the Restructuring Process, and (iv) consulting on a regular basis with the Debtors' management with respect to the foregoing.

11. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtors' personnel and professionals, my knowledge and review of relevant documents including the Debtors' books and records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

12. The Debtors have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "<u>First Day Motions</u>") in order to minimize potential adverse effects of the bankruptcy filings and to maximize the value of the estate. I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of these Chapter 11 cases and in support of the Debtors' voluntary petitions and First Day Motions.

13. I believe the relief sought in each of the First Day Motions is (i) necessary for the Debtors to make a successful transition to and operate in chapter 11 with minimal interruption or disruption to their business, and (ii) constitutes a key factor in maximizing and preserving the value of the Debtors' estates.

<u>CAUSES OF BANKRUPTCY FILING</u>

14. The Debtors experienced significant cost overruns in remodeling and preparing to open to the Restaurant to the public on October 19, 2019.

15. After only five (5) months of operations, the Restaurant was forced to close on March 16, 2020 as a result of the government-mandated restaurant shutdown as a result of the Covid-19 pandemic (the "Shutdown").

16. As a result of the Shutdown, the Debtors did not generate the operations and income initially projected. In fact, operations and income were dramatically reduced.

17. Because operations and income did not achieve projected levels, the Debtors fell behind with their creditors despite obtaining a Paycheck Protection Program ("PPP") loan of $505,022 and an Economic Disaster Injury Loan ("EDIL") of $149,900.

18. During the middle of the Shutdown, Debtors' main contractor sued Authentiki and me, alleging $400,000 unpaid obligations associated with the Restaurant's remodeling, commencing Wolverine Building Company, LLC v. Mark A. Sellers, et al., Case No. 20-03011-CBB, (the "State Case") in the Grand Rapids Circuit Court, State of Michigan. While the State Case was initially stayed due to Shutdown restrictions, those restrictions have been lifted and the State Case was progressing until it was settled on the Petition Date prior to filing the Cases.

19. On June 8, 2020, the Shutdown restrictions affecting restaurants were eased allowing for up to 50% occupancy.

20. Since the reopening of the Restaurant in a limited capacity, its customers are returning and the Debtors' business is slowly returning to profitability.

21. However, the return to profitability will not be swift enough to satisfy other creditors asserting claims against the Debtors and, therefore, the Debtors filed the Chapter 11 cases in order to preserve their value and restructure their debts in a way that is beneficial to Debtors, their creditors, and equity.

## NATURE OF DEBT

22. Upon information and belief, the United States Small Business Administration ("SBA") will assert a first priority secured claim for the EIDL in the principal amount of $149,900 as of May 29, 2020. SBA may assert that its claim is secured by substantially all of Authentiki's assets including its Cash Collateral (defined herein).

23. Upon information and belief, the Landlord will assert a first priority asset lien against all of MSSH's personal property, including inventory, located at the Restaurant Location, securing MSSH's rent obligation including, without limitation, approximately $76,923 in unpaid back rent.

24. Upon information and belief, Wolverine Building Group, Inc. ("Wolverine") will assert a second priority secured claim in the principle amount of $125,000 as of October 28, 2020 against Authentiki. It is anticipated that Wolverine will assert that its claim is secured by substantially all of Authentiki's assets including its Cash Collateral.

25. Upon information and belief, no other creditors have or will assert an interest in Debtors' Cash Collateral.

26. Uniform commercial code reports from the State of Michigan for each Debtor identified three (3) additional secured creditors, which assert interests in specific equipment allegedly leased by such secured creditor to the Debtors and used in the Restaurant.

27. Nothing in this Declaration may be construed as an admission with respect to liability for any indebtedness, nor should anything within this Declaration be construed as an admission with respect to the extent, status, validity and/or enforceability of any lien against any Debtors or their assets.

## REQUEST FOR USE OF CASH COLLATERAL

28. As of the Petition Date, Debtors, without admission, believes that their cash collateral, as defined in 11 U.S.C. §363, (the "Cash Collateral") consisted of the following collateral:

    a. Cash of approximately $4,778.85 in Authentiki, LLC and $283,522.30 in MSSH, LLC;

    b. Accounts receivable valued at approximately $2,634.30 in MSSH, LLC, which are solely comprised of undeposited credit card payments; and

    c. Inventory of approximately $36,598.84 in Authentiki, LLC and $68,050 in MSSH, LLC.

29. Debtors require the use of Cash Collateral to make such payments as are necessary for the continuation of its business as shown in the Budget, attached to the Cash Collateral Motion as **Exhibit B** (the "Budget"). The projected revenue and expenses in the Budget are based upon historical financial data.

30. The Budget projects Debtors' anticipated revenue and expenses and demonstrates the amount of funds Debtors must expend on its operations over a thirty-day period.

31. During the first twenty-eight (28) days of these cases, Debtors project that they will need to spend approximately $230,110.00, as set forth in the Budget, to avoid immediate and irreparable harm.

32. The Debtors anticipate that during that same 28-day period, there will be a significant equity cushion in Cash Collateral to protect such parties' interest in Cash Collateral.

33. The majority of the Debtors' value arises from their ongoing operations and their ability to continue servicing their customers and operating the Restaurant.

34. Without the ability to make the payments as set forth in the Budget, Debtors will be unable to continue operating and will be forced to shut down. Debtors' value arises from their on-going operations. If the Debtors are unable to continue to operate, the Restaurant will go dark, customers will be lost, and Debtors' value will be destroyed. Accordingly, authorizing Debtors to use Cash Collateral as set forth in the Budget is in the best interests of all creditors and parties-in-interest.

35. On October 28, 2020, the Landlord and Wolverine consented in writing to the Debtors use of Cash Collateral between the Petition Date and the date a hearing is set on the Cash Collateral Motion.

36. The Debtors have set aside and earmarked $149,900, the full amount the SBA may claim is owed by the Debtors, pending entry of an interim order on the Cash Collateral Motion.

## WAGE MOTION

37. The Debtors employ approximately 55 hourly and salary employees (the "Employees"). Of these Employees, seven (7) are paid a salary and the remaining employees are paid hourly. Forty-three (43) of the hourly employees are part-time employees.

38. The vast majority of the value of Debtors' business arises from their ongoing operations. The Employees are instrumental in allowing the Debtors to continue operating as a going concern.

39. The Employees provide services to MSSH, but are employed and paid by Authentiki. MSSH pays the full amount of all wages, salaries, and benefits provided to the Employees to Authentiki, who, in turn, pays that amount to the payroll provider Estratex/Toast.

40. Shannen Conn, the Debtors' bookkeeper, and I also provide services to Authentiki.

41. Since October 12, 2020, I have received a salary of $100,000 per year or $3,846.15 per pay period from the Debtors. Prior to October 12, 2020, I did not receive any compensation from the Debtors and provided my services free of charge. However, I was recently terminated from my position with Barfly Ventures, LLC due to that company's sale to a new owner, and I require the income to cover living expenses.

42. Before the Petition Date, and in the ordinary course of business, the Debtors typically paid obligations relating to wages (the "Wages") on a bi-weekly basis. Wages are paid every two weeks on Monday for the week period ending seven days earlier. Payroll is funded to the payroll provider on the Wednesday before payday, which is the following Monday. The Wages are paid by direct deposit or check.

43. The next payroll is due to be paid to the Employees on Wednesday, November 16, 2020 and must be funded to the payroll provider on or before November 11, 2020. Prior to the Petition Date, the Debtor funded the payroll in the approximate amount of $67,000 due on and through October 27, 2020.

44. On November 16, 2020, the Debtors will owe the gross amount of approximately $67,000.00 to its Employees for the period from October 26, 2020 through November 8, 2020. Approximately $10,000 of this amount will be compensation to Employees for pre-petition services ("Pre-Petition Wages"). The Pre-Petition Wages must be funded on November 11, 2020.

45. The Debtors are required by law to withhold from its Employees' Wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes

(collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").

46. The Debtors are also required to make matching payments from their own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (together with the Withholding Taxes, the "Payroll Taxes").

47. Wages and Payroll Taxes are collectively, the "Employee Obligations".

48. In the ordinary course of their business, the Debtors established certain employee benefit programs, including without limitation, medical insurance programs (collectively, the "Employee Benefits").

49. Debtors provides medical insurance to the Employees through Blue Cross Blue Shield by Authentiki and paid by MSSH. The Debtors pay 50% of the health insurance expenses for the salaried Employees, and the participating salaried Employees pay the remaining balance through deduction from their Wages. The Debtors withhold amounts ranging from $2,500.00 to $3,500.00 per month in the aggregate from salaried Employee's Wages on account of medical insurance, which amount is paid monthly together with Debtors' portion to the medical insurer.

50. The Debtors do not provide any 401K or other retirement savings programs to its employees.

51. No payment to any employee for Pre-Petition Wages will exceed $13,650 which is the priority amount permitted under 11 U.S.C. § 507(a)(4).

{00874315.2}
9

52. If the Debtors are unable to pay Employee Obligations and Employee Benefits when due, the Employees may suffer extreme personal hardship and be unable to pay their daily living expenses.

53. Furthermore, if the Debtors do not pay the Employee Obligations and Benefits, Employees may quit or walk off the job leaving the Debtors without the ability to operate and crippling Debtors' reorganization at the outset of the proceeding.

54. Given the uncertainty of the Chapter 11 process and the upheaval which the transition to Chapter 11 may have on Employees, it is important for the Debtors to retain these experienced Employees and maintain the good will of these Employees so that Debtors' business operations are not adversely harmed.

### UTILITIES MOTION

55. The Debtors' utility providers (each a "Utility" and collectively the "Utilities") are responsible for providing the Debtor with, *inter alia*, water, sewer, electricity, gas, telephone, and waste-removal services (collectively the "Services"). The Debtors' business cannot operate without the Services and any discontinuation of the Services, even for a brief period, would severely disrupt the Debtors' business operations and impair the Debtors' ability to achieve an orderly and successful reorganization.

56. Before the Petition Date, the Debtors were current with their Utility providers.

57. The Debtors intends to pay post-petition obligations owed to the Utilities in a timely manner from operating revenues, which the Debtors believe provides sufficient adequate assurance of future performance. However, to avoid any disputes regarding adequate assurance

of future performance, the Debtors propose a process to consensually resolve any disputes and if that process is unsuccessful to have this Court determine the appropriate adequate assurance of performance.

### DEBTORS' GIFT CERTIFICATE MOTION

58. The Debtors' business depends on the loyalty of its customers.

59. The Debtors has instituted a gift certificate incentive program designed to retain existing customers and to attract new customers ("Gift Certificate Program"). Gift card programs such as the Gift Card Program are standard in the restaurant industry.

60. Through the Gift Card Program, customers can purchase pre-paid, non-expiring electronic or physical gift cards in various denominations (the "Gift Cards"), which are redeemable for food and beverages at the Debtors' Restaurant. The Gift Cards are not redeemable for cash and thus will not require any cash outlay.

61. The Debtors sell the Gift Cards at the Restaurant and on their website and through third party sellers.

62. Additionally, in the ordinary course, the Debtors conduct distributions of coupons and other discounts ("Coupons"). The Debtors occasionally conduct sales promotions both online and at the Restaurant (the "Sales Promotions"). The Sales Promotions consist of credits or discounts on meals or other promotions. The Sales Promotions can be presented by customers at the time of purchase at the Debtors' restaurant. The Coupons and Sales Promotions are not redeemable for cash and thus do not require a cash outlay by the Debtors.

63. The Debtors estimate that approximately $32,110.01 in outstanding Gift Card, Coupons, and Sales Promotions (collectively, the "Customer Programs") obligations. The

redemption of Gift Cards and other customer programs varies during the calendar year but the Debtors estimate that approximately $19,226.00 in Gift Cards will be redeemed through the end of the fourth quarter 2020.

64. The Debtors maintain a liability on their books and records for unredeemed Gift Cards until redemption as they do not expire

65. [Additionally, the Debtors cannot treat the holders of Gift Card, Coupons, or Sales Promotions as ordinary unsecured creditors because the Debtors have no way of notifying such individuals and entities of the Cases since they do not keep records of who purchases them or whether they have been given to as gifts to others.]

66. Through the Customer Program Motion, the Debtors seek authorization but not direction to, in a manner consistent with their past practices, (a) honor all Customer Programs, including Gift Cards, purchased by or issued to customers prior to the Petition Date and (b) maintain the Customer Programs after the Petition Date.

67. Without the ability to continue the Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk losing customer loyalty, goodwill, and market share, which would cause a precipitous decline in the value of its business.

68. For the foregoing reasons, the Debtors submit that the relief requested in the Customer Programs Motion is in the best interest of the Debtors, their estates and their creditors and should be approved.

### DEBTORS' NEED FOR SHORTENED NOTICE AND IMMEDIATE HEARING ON FIRST DAY MOTIONS

69. The First Day Motions seek various forms of relief which the Debtors require in order to allow them to continue operations and maintain the going-concern value of their

business and prevent irreparable financial harm to Employees and other parties. The relief sought is, therefore, critical to the success of the Debtors' reorganization efforts, and the need to have the First Day Motions heard as soon as practicable outweighs any concerns that expedited hearing on these motions might raise.

70. For the reasons set forth herein, it is necessary that the Debtors obtains an interim hearing as soon as possible on the First Day Motions (the "First Day Hearing") but in no event later than the afternoon of November 2, 2020.

71. Declarant says nothing further.

Pursuant to 28 U.S.C. § 1746, I declare to the best of my knowledge, under penalty of perjury, that the above statements are true and correct.

/s/ Mark A Sellers, III
Mark A Sellers, III, Declarant

Dated: October 29, 2020

{00874315.2}